KENNETH E. KELLER (SBN 71450) (kkeller@kksrr.com)
MICHAEL D. LISI (SBN 196974) (mlisi@kksrr.com)
TANYA I. WEI (SBN 240867) (twei@kksrr.com)
KRIEG, KELLER, SLOAN, REILLEY & ROMAN LLP
555 Montgomery Street, 17th Floor
San Francisco, CA 94111
Telephone:     (415) 249-8330
Facsimile:      (415) 249-8333

KURTIS D. MACFERRIN (SBN 178006) (Kurtis.MacFerrin@lifetech.com)
CORA LOUISE SCHMID (SBN 237267) (cora.schmid@lifetech.com)
LIFE TECHNOLOGIES CORPORATION
5791 Van Allen Way
Carlsbad, CA 92008
Telephone:     (760) 603-7200
Facsimile:      (760) 602-6500

Attorneys for Plaintiff
LIFE TECHNOLOGIES CORPORATION

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LIFE TECHNOLOGIES CORPORATION,<br><br>Plaintiff,<br><br>vs.<br><br>BIOSEARCH TECHNOLOGIES, INC.,<br><br>Defendant. | Case No.: 3:10-cv-02665 JAH (WVG)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF LIFE TECHNOLOGIES CORPORATION'S MOTION TO DISMISS COUNTERCLAIMS OF DEFENDANT BIOSEARCH TECHNOLOGIES, INC.**<br><br>**Hearing Date: June 20, 2011**<br>**Time: 2:30 p.m.**<br>**Courtroom: 11**<br>**Judge: John A. Houston** |

# TABLE OF CONTENTS

**PAGE(S)**

I.    INTRODUCTION ..................................................................................................... 1

II.   FACTUAL ALLEGATIONS ................................................................................... 1

    A.   Life Tech's Complaint ................................................................................... 1

    B.   Biosearch's Answer and Counterclaims ........................................................ 1

III.  ARGUMENT ........................................................................................................... 3

    A.   Motion to Dismiss Standard .......................................................................... 3

    B.   Biosearch Has Not Adequately Pled Its Claim for Breach of Contract ............. 4

        1.   Biosearch Fails to Allege That Any Probes Allegedly Sold
            Under the EULA Were Used In Violation of the EULA ........................ 5

        2.   Biosearch Has Not Adequately Alleged the Existence of A
            Contract Between Itself and Life Tech Governing the
            Accused Use of BHQ® ........................................................................ 6

        3.   Biosearch Has Neither identified a Contract Between Life
            Tech and Glen Research Nor Alleged That It Would Have the
            Right to Enforce Such a Contract ........................................................ 8

        4.   Life Tech Cannot Have Breached a Purported Contract
            Between Biosearch and Glen Research ................................................. 9

    C.   Biosearch's State Law Tort Claims Should Also Be Dismissed ........................ 9

        1.   Unfair Competition Under Bus. & Prof. Code § 17200 .......................... 9

        2.   False Advertising Under Bus. & Prof. Code Section 17500 ................. 10

        3.   Intentional Interference with Prospective Economic
            Advantage ........................................................................................ 10

        4.   Common Law Unfair Competition ...................................................... 13

    D.   Biosearch's State Law Counterclaims Should Be Dismissed With
        Prejudice Because Amendment Would Be Futile .............................................. 14

IV.  CONCLUSION ..................................................................................................... 15

i

1

## TABLE OF AUTHORITIES

2

**PAGE(S)**

3

**Cases**

4

*Alexander v. Codemasters Group Ltd.*,
    104 Cal.App.4th 129 (2002) ................................................................. 7

5

*Am. Employers Group, Inc. v. Employment Dev. Dep't*,
    154 Cal.App.4th 836 (2007) ................................................................. 7

6

7

*Ashcroft v. Iqbal*,
    129 S. Ct. 1937 (2009) ................................................................. 4, 12

8

*Banner Entm't, Inc. v. Superior Court*,
    62 Cal.App.4th 348 (1998) ................................................................. 7

9

10

*Bell Atlantic v. Twombly*,
    550 U.S. 544 (2007) ................................................................. 4

11

*CDF Firefighters v. Maldonado*,
    158 Cal.App.4th 1226 (2008) ................................................................. 4

12

13

*Della Penna v. Toyota Motor Sales, U.S.A., Inc.*,
    11 Cal.4th 376 (1995) ................................................................. 11

14

*Gold v. Gibbons*,
    178 Cal.App.2d 517 (Cal.App. 1960) ................................................................. 8

15

16

*Hamilton v. State Farm Fire & Casualty Co.*,
    270 F.3d 778 (9th Cir. 2001) ................................................................. 14

17

*Hilderman v. Enea Teksci, Inc.*,
    551 F.Supp.2d 1183 (S.D. Cal. 2008) ................................................................. 12

18

19

*Holden v. Hagopian*,
    978 F.2d 1115 (9th Cir. 1992) ................................................................. 4

20

*JRS Products, Inc. v. Matsushita Electric Corp. of America*,
    115 Cal.App. 4th 168 (2004) ................................................................. 11

21

22

*Klamath-Lake Pharm. Ass'n v. Klamath Med. Serv. Bureau*,
    701 F.2d 1276 (9th Cir.1983) ................................................................. 14

23

*Knowles v. Pacific Gas & Elec. Co.*,
    No. C 07-2284 CW, 2008 WL 2705097, *3 (N.D. Cal. July 8, 2008) ................................................................. 14

24

25

*Korea Supply Co. v. Lockheed Martin Corp.*,
    29 Cal. 4th 1134 (2003) ................................................................. 12

26

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
    519 F.3d 1025 (9th Cir.2008) ................................................................. 14

27

28

ii

*Marder v. Lopez,*
    450 F.3d 445 (9th Cir. 2006) ................................................................... 4

*Palestini v. Homecomings Financial*, LLC,
    10CV1049-MMA, 2010 WL 3339459, *13 (S.D. Cal. Aug. 23, 2010) .................................. 4

*Pedroza v. Gonzalez,*
    Civil No. 09-CV-1766-LAB (WVG), 2010 WL 6052381, *3 (S.D. Cal. Dec. 13, 2010) ........ 4

*Pestube Systems, Inc. v. HomeTeam Pest Defense, LLC,*
    No. CIV-05-2832-PHX-MHM, 2006 WL 1441014, at *7 (D. Ariz. May 24, 2006) .............. 1

*Reddy v. Litton Indus., Inc.,*
    912 F.2d 291 (9th Cir.1990) ................................................................... 14

*Rondberg v. McCoy,*
    No. 09-CV-1672-H (CAB), 2009 WL 3017611, *3 (S.D. Cal. Sept. 21, 2009) ..................... 4

*Sprewell v. Golden State Warriors,*
    266 F.3d 979 (9th Cir. 2001) ................................................................... 4

**Statutes**

Bus. & Prof. Code § 17200 ................................................................... 1, 9

Cal. Bus. & Prof. Code § 17500 ................................................................... 1

Cal. Civ. Code § 1565 ................................................................... 7

Cal. Civ. Code § 1580 ................................................................... 7

Fed. R. Civ. P. 12(b)(6) ................................................................... 3, 4, 14

**Other Authorities**

5A C. Wright and A. Miller, Federal Practice and Procedure; Civil 2D, § 1346 (2d ed. Supp.
    2002) ................................................................... 2

iii

# I.     INTRODUCTION

Defendant and counterclaimant Biosearch Technologies, Inc. ("Biosearch") has chosen to base all of its state law counterclaims on a single theory – that Plaintiff Life Technologies Corporation ("Life Tech") breached a purported contractual agreement between itself and Biosearch.  The problem for Biosearch, however, is that it has failed to adequately plead the existence of any contract which governed the accused behavior.  Having failed to plead this most basic element of its breach of contract counterclaim, all of Biosearch's state law counterclaims that depend upon this theory of breach should be dismissed.  Moreover, because Biosearch's current allegations make clear that it could not amend to plead such a contract, let alone its breach, and because Biosearch has already had one opportunity to correct this defect, those counterclaims should be dismissed with prejudice.

# II.     FACTUAL ALLEGATIONS

## A.     Life Tech's Complaint

Life Tech filed the initial complaint in this action on December 27, 2010.  The complaint alleged that Biosearch infringed United States Patent No. 7,160,997 by selling, among other things, fluorescent-labeled probes for DNA analysis, including Biosearch's "BHQ®plus" probes. Life Tech seeks damages and injunctive relief based on Biosearch's infringement.

## B.     Biosearch's Answer and Counterclaims

On March 4, 2011, Biosearch answered the Complaint, and asserted counterclaims for patent infringement, as well as state law claims for (1) breach of contract, (2) unfair competition under Cal. Bus. & Prof. Code § 17200, (3) unfair advertising under Cal. Bus. & Prof. Code § 17500, (4) intentional interference with prospective economic advantage; and (5) common law unfair competition.  (*See* e-Docket No. 13)("the Counterclaim").[1]

---

[1] The filing of this Motion to Dismiss the state law counterclaims tolls the deadline for Life Tech to respond to the patent infringement counterclaims (Sixth, Seventh and Eighth Counterclaims).  *See, e.g., Pestube Systems, Inc. v. HomeTeam Pest Defense, LLC*, No. CIV-05-2832-PHX-MHM, 2006 WL 1441014, at *7 (D. Ariz. May 24, 2006) ("[T]he majority of

1

In support of its state law counterclaims, Biosearch alleges that it sells "fluorescence-quenched" probes for use in gene expression analysis and disease detection.  (Counterclaim, ¶ 8).  The fluorescence-quenched probes include "on one end, a reporter dye that emits fluorescence, and, on the other end, a quencher dye that inhibits fluorescence."  (*Id*., ¶ 9).  Biosearch alleges that, in or around 2000, it developed a quencher known as the Black Hole Quencher ("BHQ®").  (*Id*.).

Biosearch alleges that it sold "BHQ® probes, active esters, and amidites to Defendant Life Tech's predecessor, Invitrogen Corporation" starting "at least as early as 2001." (Counterclaim, ¶ 10).  Biosearch contends that it "included a written comprehensive limited use Agreement (the 'EULA') with all purchases of its BHQ®s."  (*Id.*, ¶ 10).  Biosearch does not allege that it entered into any other agreements with Life Tech's predecessor nor that it entered into any agreements directly with Life Tech.   Specifically, Biosearch claims that this EULA "was included in all contracts, published on Biosearch's website, and included in any shipments made to customers or by licensed distributors."  (*Id.*).  The EULA, which Biosearch attaches as Exhibit A to the Counterclaim, states that "The BHQ®, CAL Fluor® and Quasar dyes and products incorporating them are to be used for research and development purposes only and may not be used for any commercial, clinical, in vitro diagnostic or other use." (Counterclaim, Ex. A).  The EULA states that "[t]here is no implied license for commercial use with respect to the Products," and defines "commercial use" to include, without limitation, "the sale, lease, license or other transfer of the products or any material derived there from."  (*Id*.). Biosearch also alleges on information and belief that Life Tech "was aware of the EULA's terms, understood the limitations imposed by the EULA, and agreed to be bound by the terms

---

courts have expressly held that even though a pending motion to dismiss may only address some of the claims alleged, the motion to dismiss tolls the time to respond to all claims."); *see also* 5A C. Wright and A. Miller, Federal Practice and Procedure; Civil 2D, § 1346, 146 (2d ed. Supp. 2002) ("the weight of the limited authority on this point is to the effect that the filing of a motion that only addresses part of a complaint suspends the time to respond to the entire complaint, not just to the claims that are the subject of the motion.").  Life Tech will respond to those counterclaims once the issues regarding the state law counterclaims have been resolved.

---

1    of the EULA." (*Id.*).  However, Biosearch does not identify any BHQ® sales that it made to

2    either Invitrogen or to Life Tech subject to the EULA after the alleged 2001 sales.  (*Id.*).  Nor

3    does Biosearch clarify either the meaning of this vague allegation or its basis for it.

4        After the allegations concerning sales to Invitrogen in 2001, the Counterclaim jumps

5    ahead to 2009 when, according to Biosearch, the United States Center for Disease Control

6    selected BHQ® for use worldwide in testing for the H1N1 virus.  (*Id.*, ¶ 11).  Biosearch also

7    alleges that in 2009, Life Tech "arranged with a Biosearch third-party supplier, Glen Research,

8    to purchase BHQ®s from the third-party distributor of BHQ®s."  (*Id.*, ¶ 12).  It then contends

9    that the "third-party distributor's [Glen Research's] distribution rights specifically limited the

10   use of BHQ®s to research and development only and excluded commercial, clinical, and in

11   vitro diagnostic uses."  (*Id.*).  Significantly, Biosearch does not allege that it was directly

12   involved with any of these post-2009 sales.

13       According to Biosearch, Life Tech then "sold, and continues to sell, probes labeled with

14   Biosearch's BHQ®s at least as part of or in connection with the Influenza A (H1N1) Primer

15   and Probe Set (Cat. No. A11400)," and purportedly did so "for commercial, clinical, and/or in

16   vitro diagnostic purposes, including testing and detecting the presence of swine flu."  (*Id.*, ¶¶

17   13-14).  Based on these sales – which Biosearch does not allege use any of the BHQ® that Life

18   Tech's predecessor Invitrogen purchased in 2001 – Biosearch alleges that Life Tech "breached

19   one or more terms of the EULA" by incorporating the BHQ® it purchased in these post-2009

20   sales from Glen Research into Influenza A (H1N1) Primer and Probe Sets.  This alleged breach

21   of contract forms the basis of each of Biosearch's state law claims.  (*Id.* ¶¶ 16, 24-26, 35, 40,

22   46).

23                            **III.    ARGUMENT**

24       **A.    Motion to Dismiss Standard**

25       Rule 12(b)(6) of the Federal Rules of Civil Procedure provides that the Court must

26   dismiss a complaint that fails to state a claim upon which relief can be granted.  Fed. R. Civ. P.

27   12(b)(6).  When evaluating a motion to dismiss under Rule 12(b)(6), a court must limit its

28                                   3

1   review to the contents of the complaint and must "presume all factual allegations of the

2   complaint are true and draw all reasonable inferences in favor of the nonmoving party."

3   *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006); *Holden v. Hagopian*, 978 F.2d 1115, 1118

4   (9th Cir. 1992).  "However, a court need not accept as true unreasonable inferences or

5   conclusory legal allegations cast in the form of factual allegations."  *Pedroza v. Gonzalez*, Civil

6   No. 09-CV-1766-LAB (WVG), 2010 WL 6052381, *3 (S.D. Cal. Dec. 13, 2010) (citing

7   *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)).  If a party fails to allege

8   a required element of a claim, the claim should be dismissed.  *See, e.g., Rondberg v. McCoy*,

9   No. 09-CV-1672-H (CAB), 2009 WL 3017611, *3 (S.D. Cal. Sept. 21, 2009) (dismissing

10   breach of contract claim for failure to sufficiently allege existence of contract).

11          Moreover, to withstand scrutiny under Rule 12(b)(6), a counterclaimant must allege

12   "enough facts to state a claim for relief that is plausible on its face," and must allege facts

13   sufficient to "raise a right to relief above the speculative level."  *Bell Atlantic v. Twombly*, 550

14   U.S. 544, 570 (2007).  Specifically, a counterclaimant must allege more than "labels and

15   conclusions, and a formulaic recitation of the elements of a cause of action will not do."

16   *Twombly*, 550 U.S. at 555.  A claim for relief is not plausible, and must be dismissed, where a

17   complaint fails to plead "factual content that allows the court to draw the reasonable inference

18   that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937,

19   1949 (2009).  As explained below, Biosearch has not satisfied this standard with respect to its

20   state law counterclaims, and thus they should be dismissed.

21          **B.       Biosearch Has Not Adequately Pled Its Claim for Breach of Contract**

22          The centerpiece of Biosearch's state law counterclaims is its claim for breach of

23   contract.  To state a claim for breach of contract under California law, plaintiff must allege: (1)

24   the existence of a contract; (2) performance of the contract or excuse for nonperformance, (3)

25   the defendant's breach of the contract, and (4) damages resulting from the breach.  *Palestini v.*

26   *Homecomings Financial*, LLC, No. 10CV1049-MMA, 2010 WL 3339459, *13 (S.D. Cal. Aug.

27   23, 2010) (citing *CDF Firefighters v. Maldonado*, 158 Cal.App.4th 1226, 1239 (2008)).

28                                                    4

Biosearch's attempt to satisfy these elements fails in two critical respects.  First, Biosearch alleges the existence of a contract – the EULA – with Life Tech's predecessor, Invitrogen, but then fails to allege that any of the BHQ® sold to Invitrogen starting in 2001 was used in violation of that purported contract.  Then, Biosearch alleges that Life Tech's sale of the BHQ® it purchased in 2009 constituted a breach of the EULA – but Biosearch fails to adequately allege that it had a contract with Life Tech governing those sales, let alone one that incorporated the terms of the EULA.  Biosearch has thus alleged a contract without a breach, and a breach without a contract – in either case, its pleading is inadequate.  Simply stated, without sufficient allegations establishing a nexus between Life Tech's alleged breach and the only "contract" the acts are alleged to have breached, Biosearch has not met its burden of pleading that Life Tech's conduct constituted a breach of that contract, and its counterclaim for breach of contract should be dismissed.

### 1. Biosearch Fails to Allege That Any Probes Allegedly Sold Under the EULA Were Used In Violation of the EULA

Although Biosearch appears to allege the existence of a contract between itself and Invitrogen in the form of the EULA, it fails to allege that use of any of the products purchased under the EULA violated its terms.  Specifically, Biosearch alleges that in "at least" 2001, it sold BHQ® probes directly to Life Tech's predecessor, Invitrogen, and that "at all times relevant herein Biosearch included a written comprehensive limited use Agreement (the "EULA") with all purchases of its BHQ®s."  (Counterclaim, ¶ 10).  However, Biosearch does not allege that any of this BHQ® purchased by Invitrogen subject to the EULA was used inconsistently with the terms of the EULA by either Invitrogen or by Life Tech, and so does not state a claim for breach of the EULA based on the 2001 sales.  Nor does Biosearch allege that it entered into an agreement with either Invitrogen or Life Tech regarding the use of BHQ® purchased separately from third parties.

Perhaps recognizing this deficiency, Biosearch includes in the same paragraph of the Counterclaim the allegation, made on information and belief, that Life Tech "agreed to be

5

bound" by the EULA.  (*Id.*).  But this vague statement fails to identify any further BHQ® sales that were governed by the EULA.  (*See id.*)  Notably, Biosearch has not alleged that Life Tech unilaterally agreed to apply the terms of the EULA to subsequent BHQ® purchases from third parties.  (*Id.*).  Further, the allegation itself is, on its face, inadequate to establish a contract between Biosearch and Life Tech for the BHQ® that Life Tech purchased from third parties. Biosearch does not allege such a contract directly, and its allegations concerning Invitrogen's purchases and Life Tech's purported "agree[ment] to be bound" lack the necessary factual allegations to establish such a contract.  Such a conclusory allegation, without any supporting factual allegations, fails to meet Biosearch's pleading obligations because it is nothing more than the formulaic recitation of claim elements criticized in *Twombly*.  It does not provide the requisite "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 129 S. Ct. at 1949.

Indeed, Biosearch's juxtaposition of the allegations regarding direct sales to Invitrogen with the conclusory allegation that Life Tech "agreed" to the terms of the EULA – with no express allegation of which products Life Tech "agreed" were governed by the EULA or even when Life Tech made such an agreement – underscores this critical failing in the pleadings. There is simply no allegation that Life Tech contracted with Biosearch that BHQ® purchased from a third party in 2009 would be governed by a EULA which allegedly governed sales made in 2001.  As such, Biosearch fails to allege any materials governed by the EULA were used in violation of it.  Biosearch's allegations regarding the EULA do not support its claim for breach of contract.

### 2. Biosearch Has Not Adequately Alleged the Existence of A Contract Between Itself and Life Tech Governing the Accused Use of BHQ®

After identifying a purported contract without identifying a corresponding breach, Biosearch next identifies actions it claims constitute a breach but fails to allege the existence of a contract between itself and Life Tech that was purportedly breached.  Specifically, Biosearch alleges that the basis of its breach claim is that, in or after 2009, Life Tech sold probes "labeled

6

with Biosearch's BHQ®s at least as part of or in connection with the Influenza A (H1N1) Primer and Probe Set." (Counterclaim, ¶ 13).  However, the Counterclaim does not allege that this BHQ® was purchased directly from Biosearch.  Instead it alleges the purchases were "arranged with a Biosearch third-party supplier, Glen Research." (*Id.*, ¶12).  Because Biosearch has not alleged that these probes were purchased under any contract between itself and Life Tech, its breach of contract claim should be dismissed.

As discussed above, Biosearch has notably failed to allege that the relevant sales were governed by the EULA.  Nor does anything in the Counterclaims allege the existence of any other contract between Biosearch and Life Tech.  In order to establish the existence of a contract, there must be a meeting of the mind between the parties as to the material terms.  *See Am. Employers Group, Inc. v. Employment Dev. Dep't,* 154 Cal.App.4th 836, 846 (2007) ("[T]here is no contract until there has been a meeting of the minds on all material points.") (quoting *Banner Entm't, Inc. v. Superior Court,* 62 Cal.App.4th 348, 358 (1998)).  "Mutual intent is determinative of contract formation because there is no contract unless the parties thereto assent, and they must assent to the same thing, in the same sense." *Banner,* 62 Cal.App.4th at 358-59; *see also* Cal. Civ. Code § 1580.  Whether there is mutual assent as to the material terms of a purported contract is determined by application of an objective standard to the "outward manifestations or expressions of the parties, *i.e.*, the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings." *Am. Employers Group*, 154 Cal.App.4th at 847 (quoting *Alexander v. Codemasters Group Ltd.*, 104 Cal.App.4th 129, 141 (2002)); *see also* Cal. Civ. Code § 1565 (consent must be mutual and communicated by each party to the other).

While Biosearch juxtaposes its allegations of Life Tech's purchases from Glen Research with the conclusory allegation that Life Tech sold its H1N1 Primer and Probe Sets "in contravention of the Biosearch license," that juxtaposition is not a substitute for specific allegations that Life Tech's actions were subject to an identified contract between Biosearch and Life Tech.   (Counterclaim, ¶ 13).  The only license "agreement" referenced in the

7

1    Counterclaim is the EULA and, as noted, Biosearch has not adequately pled that the BHQ®

2    purchased for the Influenza A (H1N1) Primer and Probe Set was subject to the EULA.[2]  Such

3    attempts to imply a contractual relationship with Life Tech without alleging facts to establish

4    that one actually exists does not meet the standard of *Twombly* and *Iqbal*.

5         Biosearch does not allege that it and Life Tech entered into a contract related to the

6    BHQ® used in the Influenza A (H1N1) Primer and Probe Set, let alone a contract that

7    incorporated the limitations of the EULA.  Nor are there any allegations that Life Tech and

8    Biosearch ever had a meeting of the minds as to the terms of such a contract.  The absence of

9    such allegations alone warrants dismissal of the breach of contract counterclaim.

10             **3.    Biosearch Has Neither identified a Contract Between Life**
                      **Tech and Glen Research Nor Alleged That It Would**
11                    **Have the Right to Enforce Such a Contract**

12        Given Biosearch's failure to allege a contract between itself and Life Tech, and the fact

13   that the breach it alleges is based on Life Tech's purchase of BHQ® from Glen Research, it

14   appears that Biosearch is really seeking contract damages based on a purported breach of a

15   contract between Life Tech and Glen Research.  Yet Biosearch has not alleged that it would

16   have any right to sue for breach of any such contract between Life Tech and Glen Research.

17   *See Gold v. Gibbons*, 178 Cal.App.2d 517, 519 (Cal.App. 1960) ("Breach of contract cannot be

18   made the basis of an action for damages against defendants who did not execute it and who did

19   nothing to assume its obligations.").  Moreover, Biosearch has not even alleged that a contract

20   existed between Life Tech and Glen Research regarding use of purchased BHQ®:  it has not

21   alleged any terms of a purported contract between Life Tech and Glen Research, and it notably

22   does not allege that Life Tech and Glen Research agreed that the terms of the EULA would

23   apply to their transactions.  (*See id.* ¶ 13).  These omissions are critical, as the only allegation

24   of breach is the purported breach of the EULA's restriction on sales for "commercial, clinical

25

26   _____

27   [2] Even the allegations concerning Glen Research fail to allege that Glen Research agreed to be
     bound by the EULA.  (*See* Counterclaim, ¶ 12 ("The third-party distributor's distribution rights
     specifically limited the use of BHQ® . . . .")).

28                                          8

_____

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF LIFE TECHNOLOGIES CORPORATION'S MOTION TO DISMISS COUNTERCLAIMS OF
DEFENDANT BIOSEARCH TECHNOLOGIES, INC.
CASE NO. 3:10-cv-02665 JAH (WVG)

and/or in vitro diagnostic purposes."  *See* ¶ 16 ("Life Tech breached one or more terms of the EULA").  Indeed, Biosearch has failed to make any allegations regarding any agreements between Life Tech and Glen Research that could serve as the basis for Biosearch's insufficient contract claim.

### 4.    Life Tech Cannot Have Breached a Purported Contract Between Biosearch and Glen Research

The only allegations in Biosearch's Counterclaims that might suggest the existence of a contractual relationship related to the BHQ® used for the Influenza A (H1N1) Primer and Probe Set are the allegations regarding a relationship between Biosearch and Glen Research, which did not involve Life Tech.  Biosearch appears to allege that it had a contractual relationship with Glen Research, and that its contractual relationship with Glen Research imposed restrictions on Glen Research's rights to distribute BHQ®.  While such allegations might support a breach of contract claim by Biosearch against Glen Research, it does not support Biosearch's counterclaim against Life Tech, and certainly not a claim for breach of the EULA.

There are simply no allegations that Biosearch and Life Tech were parties to any "contract" governing the accused use of BHQ® or that Biosearch has a right to sue under any such "contract."  The First Counterclaim for breach of contract should be dismissed.

### C.    Biosearch's State Law Tort Claims Should Also Be Dismissed

Biosearch's failure to adequately plead its claim for breach of contract also sounds a death knell for its remaining state law counterclaims because each is based on Life Tech's alleged breach of the EULA.  As such, all of the state law counterclaims should also be dismissed.

### 1.    Unfair Competition Under Bus. & Prof. Code § 17200

Biosearch's Second Counterclaim alleges that Life Tech has violated Business & Professions Code Section 17200.  Specifically, Biosearch contends that Life Tech committed unfair and unlawful business acts and practices by deciding "to breach its license obligations to

9

1    Biosearch, and exploit the commercial opportunity presented by the H1N1 pandemic," and by

2    purchasing BHQ®s from Glen Research and "wrongfully using the BHQ®s <u>in contravention of</u>

3    <u>the license terms</u>." (Counterclaim, ¶¶ 24-26) (emphasis added).

4         On its face, this counterclaim is dependent upon the existence of a license agreement or

5    contract between Life Tech and Biosearch.  However, as demonstrated above, Biosearch has

6    not alleged the existence of any such license agreement, or any other "license obligations" that

7    Life Tech owed to Biosearch in connection with Life Tech's purchase and sale of BHQ® from

8    Glen Research.  Having relied solely on its inadequately pled breach of contract claim as the

9    foundation of its claim of statutory unfair competition, Biosearch cannot maintain its

10   counterclaim under Section 17200.

11              **2.       False Advertising Under Bus. & Prof. Code Section 17500**

12        Biosearch's Third Counterclaim for false advertising under Business & Professions

13   Code Section 17500 is similarly defective.  The Section 17500 counterclaim is based on the

14   theory that Life Tech falsely advertised that it could sell probes with BHQ® despite the fact

15   that "the EULA prohibits 'commercial use,' which is defined as without limitation 'sale[s],' of

16   Biosearch's BHQ®s, or products incorporating these BHQ®s."  (Counterclaim, ¶ 35).

17        Once again, Biosearch relies on its contention that Life Tech had a contractual

18   obligation to Biosearch under the EULA.  Even assuming that Biosearch's description of the

19   EULA's limitations is correct, without allegations establishing that Life Tech had a contractual

20   obligation to abide by the EULA, Biosearch has not plead facts sufficient to suggest that Life

21   Tech's advertising was "false."  Yet, as discussed above, Biosearch has not adequately pled

22   that Life Tech was bound by the EULA, or had any contractual obligation to Biosearch.  As

23   such, the Third Counterclaim for false advertising under Section 17500 should be dismissed.

24              **3.       Intentional Interference with Prospective Economic Advantage**

25        Biosearch next alleges that Life Tech has interfered with Biosearch's prospective sales

26   and/or relationships with "potential suppliers for the Indian market," including a company

27   called Gene Logic.  Although Biosearch attempts to camouflage the contractual basis for this

28                                              10

1   claim, a closer review of the allegations demonstrates that, like the other state law claims, the

2   interference claim also depends on Biosearch's insufficient claim for breach of contract.

3            Specifically, Biosearch's counterclaim is premised on its allegation that Life Tech

4   "interfered with Biosearch's prospective economic advantage with at least Gene Logic along

5   with its Indian market contacts" by selling Life Tech's Influenza A (H1N1) Primer and Probe

6   Set at a "substantial discount." (Counterclaim, ¶¶ 40, 42).  Importantly, Biosearch alleges that

7   Life Tech was able to sell its H1N1 Primer and Probe Set containing BHQ® probes at a

8   "reduced price" because "Life Tech was able to purchase [the relevant] BHQ®s at price [sic]

9   far below what BHQ®s licensed for commercial uses, such as for H1N1 testing, command and

10  are in fact sold for," and that the only reason Life Tech was able to purchase for a reduced price

11  was "[b]ecause these BHQ®s were subject to a limited-use license" and thus had restrictions

12  on their use. (*Id.*, ¶¶ 40-41).  In other words, Biosearch alleges that Life Tech was able to

13  interfere with Biosearch's prospective economic advantage by virtue of purchasing and selling

14  probes in breach of the restrictions of the "limited-use license." (*Id.*).  Yet such a "limited-use

15  license," could only arise from a contract.  Consequently, because this claim relies on the

16  inadequately pled breach of contract claim, it too must fail.

17           In addition, a party claiming interference must plead and prove "the defendant's

18  interference was wrongful 'by some measure beyond the fact of interference itself.'" *Della*

19  *Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal.4th 376, 393 (1995).  The requirement of an

20  independent wrongful act has particular application where, as here, the alleged wrongful act is

21  a breach of contract.  In *JRS Products, Inc. v. Matsushita Electric Corp. of America*, 115

22  Cal.App. 4th 168, 179 (2004), the court examined the question of "whether damages can be

23  recovered for interference with prospective economic advantage by one contracting party

24  against another based on conduct that would otherwise constitute a breach of the parties'

25  contract."  The *JRS* court ruled that it could not, because to do so would permit a plaintiff to

26  recover tort damages for a breach of contract.  *Id.* at 180-183 (holding that defendant's breach

27  of contract with plaintiff "cannot be transmuted into tort liability by claiming that the breach

28                                                    11

1    detrimentally affected the [plaintiff's] business") (recognized and distinguished on other

2    grounds in *Hilderman v. Enea Teksci, Inc.*, 551 F.Supp.2d 1183, 1197 n.1 (S.D. Cal. 2008)).

3    Because the only "wrongful act" alleged here is Life Tech's purported breach of a contract with

4    Biosearch, the claim for intentional interference with prospective economic advantage cannot

5    stand.

6         The interference claim should be dismissed for yet another reason.  To state a claim for

7    intentional interference with prospective economic advantage, a plaintiff must plead: (1) an

8    economic relationship between the plaintiff and some third party, with the probability of future

9    economic benefit to the plaintiff; (2) the defendant's ***knowledge*** of the relationship; (3)

10    ***intentional acts*** on the part of the defendant ***designed to*** disrupt the relationship; (4) actual

11    disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the

12    acts of the defendant.  *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153

13    (2003).  Biosearch does not plead with sufficient specificity either Life Tech's knowledge of

14    the purported relationship with Gene Logic or that Life Tech's acts were designed to interrupt

15    that relationship.  The second element of this claim requires that Biosearch plead that Life Tech

16    had knowledge of Biosearch's relationship with the third party at issue, which Biosearch has

17    identified Gene Logic "[b]y way of example."  But Biosearch's only allegations that Life Tech

18    had knowledge of any Biosearch relationships are the vague contentions that "Life Tech knew

19    of Biosearch's ongoing business relationships with governments and other entities around the

20    world with respect to Biosearch's own H1N1 kits," and that "Life Tech further knew of

21    Biosearch's marketing activities concerning the Biosearch H1N1 Kits."  There is no allegation

22    that Life Tech knew of a relationship between Biosearch and Gene Logic, much less any

23    factual allegations as to when, where, or how Life Tech is alleged to have learned of such a

24    relationship.  Biosearch's level of pleading Life Tech's purported knowledge here is akin to the

25    allegations specifically found to be inadequate by the Supreme Court in *Iqbal*.  *Ashcroft v.*

26    *Iqbal*, 129 S. Ct. at 1951 ("It is the conclusory nature of respondent's allegations, rather than

27    their extravagantly fanciful nature, that disentitles them to the presumption of truth.").

28

1    Similarly, the third element requires that Biosearch plead Life Tech's intentional acts

2    designed to disrupt the relationship at issue, that is, "at least" the relationship between

3    Biosearch and Gene Logic.  Biosearch has only vaguely alleged that "Life Tech intentionally

4    interfered with Biosearch's prospective economic advantage with at least Gene Logic along

5    with its Indian market contacts."  But Biosearch offers as support only allegations that Life

6    Tech sought to provide materials to its customers at the lowest price, without any factual

7    allegations to establish that Life Tech's alleged actions were intentionally designed to disrupt

8    the relationship between Gene Logic and Biosearch, or that Life Tech "knew that the

9    interference was certain or substantially certain to occur as a result of its action."  *Korea*

10   *Supply*, 29 Cal. 4th at 1154.  Moreover, just as the Supreme Court has found that pleading

11   parallel behavior between multiple entities is not sufficient allegation for a conspiracy claim to

12   stand, so here pleading that a company sought to sell its product is not a sufficient allegation

13   that the company's acts were designed to disrupt a different relationship. *Twombly*, 550 U.S.

14   556-557.

15               **4.        Common Law Unfair Competition**

16   Biosearch's final state law counterclaim alleges common law unfair competition, and is

17   based entirely on the allegation that, "[b]y using probes labeled with BHQ®s in violation of the

18   EULA, including profiting from unauthorized sales of BHQ®-labeled probes, Life Tech has

19   gained an unfair competitive advantage over Biosearch."  (Counterclaim, ¶ 46).  Once more, on

20   its face this counterclaim thus requires a "violation of the EULA" and/or "unauthorized sales"

21   – in other words, it cannot proceed unless Biosearch has adequately pled that Life Tech was

22   contractually bound by, and violated, the terms of the EULA.  Yet as discussed previously,

23   there is no allegation that Biosearch and Life Tech had any contractual relationship, let alone

24   one that incorporated the terms of the EULA.  Therefore, there is no basis for the conclusory

25   allegation that Life Tech unfairly competed with Biosearch by breaching its contractual duties

26   under the EULA.  Biosearch has not properly pled this claim, and it should be dismissed as

27   well.

28

**D.     Biosearch's State Law Counterclaims Should Be Dismissed With Prejudice Because Amendment Would Be Futile**

While courts will often grant leave to amend following dismissal under Rule 12(b)(6), there are several situations where leave to amend should not be granted. Where, as here, amendment of the dismissed claims would be futile, leave to amend should be denied, and the dismissal should be with prejudice. *See, e.g.*, *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir.2008) (courts need not provide leave to amend where it is clear that complaint could not be saved by any amendment); *Klamath-Lake Pharm. Ass'n v. Klamath Med. Serv. Bureau*, 701 F.2d 1276, 1293 (9th Cir.1983) (holding that the court does not have to allow futile amendments). This includes situations where amending a complaint to avoid dismissal would require a party to plead inconsistent allegations. *Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 296 (9th Cir.1990) ("In determining whether amendment would be futile, the court examines whether the complaint could be amended to cure the defect requiring dismissal "without contradicting any of the allegations of [the] original complaint."); *Knowles v. Pacific Gas & Elec. Co.*, No. C 07-2284 CW, 2008 WL 2705097, *3 (N.D. Cal. July 8, 2008) ("Leave to amend should be liberally granted, but an amended complaint cannot allege facts inconsistent with the challenged pleading.").

In this instance the defects in the state law counterclaims cannot be remedied, and thus dismissal should be with prejudice. None of Biosearch's state law theories of liability – the alleged breach of the EULA and the other claims stemming from it – can be re-pled to state a claim because the current allegations make clear that Life Tech has only purchased BHQ® from Glen Research, and not from Biosearch. Stated differently, Biosearch has essentially conceded that it did not enter into a commercial relationship with Life Tech in or after 2009, and thus it cannot plead the requisite contractual relationship with Life Tech for the accused sales. Yet in order to state a claim under any of its state law theories, Biosearch would need to allege just that, and such allegations would be inconsistent with its current allegations. Biosearch should be estopped from now trying to allege such a contractual relationship with Life Tech. *See generally Hamilton v. State Farm Fire & Casualty Co.*, 270 F.3d 778, 782 (9th

14

1  Cir. 2001) (judicial estoppel is intended to "[p]revent a party from gaining an advantage by

2  taking inconsistent positions…and to protect against a litigant playing fast and loose with the

3  courts").

4      Moreover, Biosearch has already had the opportunity to amend its claims against Life

5  Tech to correct this defect.  The state law counterclaims asserted here were originally asserted

6  in a lawsuit that Biosearch filed in state court.  (*See* Request for Judicial Notice ("RJN"), filed

7  herewith, Ex. A).  After Life Tech successfully transferred the case to San Diego Superior

8  Court, Life Tech demurred to the complaint on essentially the same grounds asserted here.

9  (*See* RJN, Ex. B).  However, months after the demurrer was filed and only weeks before the

10  scheduled demurrer hearing, Biosearch dismissed its state court action and re-filed its claims as

11  counterclaims in this action.  (*See* RJN, Ex. C). Thus, despite notice of the deficiencies in its

12  original allegations, and an opportunity to correct those deficiencies following the dismissal of

13  its state court complaint without prejudice, Biosearch opted to re-file the same defective claims

14  with this Court.  That decision speaks volumes as to the futility of permitting further

15  amendment, and warrants dismissal with prejudice.

16                    **IV.    CONCLUSION**

17      Biosearch has now had two chances to allege viable state law claims against Life Tech,

18  and has failed in both attempts.  Its inability to allege the existence of a contract with Life Tech

19  defeats not only its breach of contract counterclaim, but also the tort counterclaims which are

20  based on that alleged breach.  Moreover, because Biosearch cannot amend its pleadings to

21  allege such a contract without contradicting its earlier allegations, amendment here would be

22  futile.  For these reasons, Life Tech respectfully requests that the Court dismiss the state law

23  counterclaims (the First through Fifth Counterclaims) with prejudice.

24  Dated:  April 25, 2011                    KRIEG, KELLER, SLOAN, REILLEY & ROMAN LLP

25                    By: _____/s/Kenneth E. Keller_____

26                    KENNETH E. KELLER
                      Attorneys for Plaintiff
27                    LIFE TECHNOLOGIES CORPORATION

28                              15
_____