KENNETH E. KELLER (SBN 71450) kkeller@kksrr.com
MICHAEL D. LISI (SBN 196974) mlisi@kksrr.com
KRIEG, KELLER, SLOAN, REILLEY & ROMAN LLP
555 Montgomery Street, 17th Floor
San Francisco, CA  94111
Telephone:      (415) 249-8330
Facsimile:       (415) 249-8333

KURTIS D. MACFERRIN (SBN 178006) kurtis.macferrin@lifetech.com
CORA LOUISE SCHMID (SBN 237267) cora.schmid@lifetech.com
LIFE TECHNOLOGIES CORPORATION
5791 Van Allen Way
Carlsbad, CA  92008
Telephone:      (760) 603-7200
Facsimile:       (760) 602-6500

Attorneys for Plaintiff
LIFE TECHNOLOGIES CORPORATION

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LIFE TECHNOLOGIES CORPORATION,<br><br>Plaintiff,<br><br>vs.<br><br>BIOSEARCH TECHNOLOGIES, INC.,<br><br>Defendant. | Case No.:  3:10-cv-02665 JAH (MDD)<br><br>**REPLY MEMORANDUM IN SUPPORT OF PLAINTIFF LIFE TECHNOLOGIES CORPORATION'S MOTION TO DISMISS DEFENDANT BIOSEARCH TECHNOLOGIES, INC.'S FIRST AMENDED COUNTERCLAIMS**<br><br>**Hearing Date:  August 8, 2011<br>Time:  2:30 p.m.<br>Courtroom:  11<br>Judge:  Hon. John A. Houston** |

# I.   INTRODUCTION

Biosearch has apparently decided that if it cannot change the facts to support its breach of contract counterclaim, its next best option is to change the law.  However, in its haste to avoid dismissal by accusing Life Tech of applying the wrong law, Biosearch has overstated both the applicability and the impact of the Uniform Commercial Code ("UCC") as adopted in California.  While the UCC may apply to the transaction between Life Tech and Glen Research, it does not apply to – and does not create a contractual relationship between – Life Tech and Biosearch.  Even if the UCC did apply, in order to enforce a contract in the form of the EULA, Biosearch must still allege the elements of contract formation, including mutual consent. Biosearch has failed to do that here.  Having failed to plead a contract under either the UCC or California common law, Biosearch's counterclaim for breach of contract should be dismissed.

At the same time, Biosearch cannot dispute that its other state law counterclaims are premised on its inadequately pled breach of contract claim.  Although Biosearch argues that certain of those claims are also premised on its false advertising claim under § 17500, it conveniently overlooks the fact that the § 17500 claim is itself based solely on the alleged breach of contract.  Those additional state law counterclaims should be dismissed as well.

# II.   ARGUMENT

### A.   Biosearch Has Not Demonstrated That It Has Standing or Has Adequately Pled Its Counterclaim for Breach of Contract

Biosearch does not contest the Constitutional requirements for standing set forth in Life Tech's Motion, nor does it dispute that there must be privity between two parties for one to enforce a contract.  Instead, Biosearch bases its Opposition on its contention that the UCC applies to the EULA, and that under Arizona Cartridge Remanufacturers Ass'n, Inc. v. Lexmark Intern., Inc., 421 F.3d 981 (9th Cir. 2005), Life Tech's purchase of BHQ®s from Glen Research with "knowledge" of the EULA was enough to form a contract and establish privity between Life Tech and Biosearch.  Biosearch is wrong on several fronts.

First, Biosearch's assumption that the unpled UCC applies to the EULA (as opposed to the Life Tech-Glen Research sales agreement) is incorrect.  Second, even if the UCC applied, it

1

1   would not entirely displace the common law of contract formation.  And finally, under either the

2   UCC or common law, the EULA is not an enforceable contract between Life Tech and

3   Biosearch because Biosearch has not alleged that Life Tech ever assented to its terms.

4         **1.**        **The Uniform Commercial Code Does Not Apply to the EULA**

5         Biosearch's suggestion that the UCC – which Biosearch did not plead – applies to the

6   EULA is wrong.  The UCC applies to contracts for the sale of goods.  Cal. Comm. Code § 2102;

7   *Comerica Bank v. Whitehall Specialties, Inc.*, 352 F.Supp.2d 1077, 1081 (C.D. Cal. 2004)

8   (finding California version of UCC "applies to contracts for the sale of goods").  As such, the

9   UCC would apply to the transaction by which Life Tech purchased BHQ®s from Glen

10  Research.  However, Biosearch was not a party to that contract – Life Tech and Glen Research

11  were the only parties to that transaction, and Biosearch has not alleged otherwise.  Therefore, if

12  the EULA is a contract between Life Tech and Biosearch (which Life Tech does not concede), it

13  must be treated and analyzed separately from any Life Tech-Glen Research purchase agreement.

14        However, the EULA itself is clearly not a "contract for sale."  UCC § 2-106(1) provides:

15        "Contract for sale" includes both a present sale of goods and a contract to sell

16        goods at a future time. A "sale" consists in the passing of title from the seller to
      the buyer for a price (Section 2-401). A "present sale" means a sale which is

17        accomplished by the making of the contract.

18  UCC § 2-106(1) (emphasis added).  It is undisputed that Biosearch did not sell the

19  BHQ®s at issue to Life Tech – Glen Research did.  Indeed, the EULA does not identify a

20  seller or a buyer, does not purport to "pass title" to any goods, and does not purport to do

21  so "for a price."  Instead, the EULA simply attempts to restrict the manner in which

22  BHQ®s "are to be used."  See First Amended Answer to Complaint and Counterclaims

23  ("FACC"), Dkt. No. 22, Ex. A.

24        Thus, because the EULA is not a "contract for sale," it is not governed by the

25  UCC.   By focusing its Opposition on the application of UCC § 2204 to the EULA,

26  Biosearch has not refuted, let alone addressed, the application of the common law of

27  contracts to the allegations here.  As detailed in Life Tech's Motion, under those

28  principles, Biosearch has not adequately pled that it was a party to any contract involving

2

Life Tech's purchase of BHQ®s from Glen Research, or that Biosearch and Life Tech mutually consented to the applicability of the EULA to those purchases.  See Mtn. at 6:17–8:10; 10:9–13:10.  Absent allegations establishing a contract between Biosearch and Life Tech, the breach of contract counterclaim fails.

> **2.     The UCC Does Not Entirely Displace Common Law and Does Not Dispense With the Requirement of Mutual Consent**

Even if Biosearch were correct that the UCC would apply to the EULA, it has incorrectly analyzed its impact here.  Biosearch argues that Life Tech's Motion must be denied because Life Tech relied on common law, rather than on the unpled UCC, to support its arguments based on lack of privity and mutual consent, implicitly suggesting that the UCC and California's common law of contract are separate and distinct bodies of law.  Not so.  Although the UCC displaces common law in certain circumstances, common law *supplements* the UCC where the UCC has not displaced it.  Cal. Comm. Code § 1103 ("Unless displaced by the particular provisions of this code, the principles of law and equity . . . supplement its provisions.").  Absent an inconsistency between the UCC and the common law, common law principles still apply.

In this case, nothing in the UCC displaces the common law principles of privity and mutual consent that are central to Life Tech's Motion.[1]  Contrary to Biosearch's contention, UCC § 2204 does not dispense with the common law principle that contract formation requires a manifestation of mutual consent.  *See* Opp'n at 8:8-22.  Section 2204 provides that "a contract for the sale of goods may be made in any manner sufficient to show *an agreement,* including conduct by *both* parties which recognizes the existence of such a contract."  Cal. Comm. Code § 2204(1) (emphasis added).  However, "[w]hether governed by the common law or by Article 2 of the Uniform Commercial Code ('UCC'), a transaction, in order to be a contract, requires a manifestation of agreement between the parties."  *Specht v. Netscape Communications Corp.*, 306 F.3d 17, 28-29 (2nd Cir. 2002) (applying California law and citing § 2204 specifically); *see*

---

[1] Biosearch does not even attempt to argue that the UCC abolishes the common law requirement of privity of contract in this context, where a manufacturer is attempting to enforce a "Limited Use Agreement" against a party who did not purchase the product from the manufacturer.

1   *also Comerica Bank*, 352 F.Supp.2d at 1081-1082 (even if UCC applied, "a valid modification

2   still requires proof of the other elements essential to the validity of a contract, including mutual

3   assent"); *Windsor Mills, Inc. v. Collins & Aikman Corp.*, 25 Cal.App.3d 987, 992 (1972)

4   (affirming that "mutual manifestation of assent . . . is the touchstone of contract").

5            Contrary to Biosearch's contention, *Steiner v. Mobile Oil Corp.*, 30 Cal.3d 90 (1977),

6   does not dispose of the common law requirement of mutual consent.  Rather, *Steiner* merely

7   provides that parties to a contract governed by the UCC do not need to manifest mutual consent

8   to *all* essential terms of the contract, because the UCC permits certain terms to be implied by

9   law.  *Id.* at 103.  Eliminating the "mirror image" rule requiring agreement as to each and every

10  term, however, is a far cry from eliminating the requirement of mutual consent in its entirety.  In

11  fact, the ruling in *Steiner* turned, in large part, on the application of UCC § 2207, which

12  expressly requires a "definite and seasonable expression of acceptance or a written confirmation

13  which is sent within a reasonable time [that] operates as an acceptance."  Thus, *Steiner* actually

14  confirms that offer and acceptance (that is, mutual consent) are still required under the UCC.

### 3.   Even Under the UCC, Biosearch Has Not Alleged the Existence of a Contract Between Itself and Life Tech

17           Even if the UCC were to apply here, it would not "save" the inadequate allegations of

18  the FACC.  The lynchpin of Biosearch's opposition is its argument that, under *Lexmark*, Life

19  Tech's purchase of BHQ®s from Glen Research with "knowledge" of the EULA was enough to

20  form a contract, and establish privity, between Life Tech and Biosearch.  Even accepting for the

21  sake of argument that the UCC applies to the EULA, Biosearch's analysis of *Lexmark* is

22  incorrect.  As noted, the UCC did not do away with common law rules of contract formation, a

23  fact underscored by an examination of the factual distinctions between *Lexmark* and this case.

24           In *Lexmark*, the Ninth Circuit affirmed the district court's conclusion that Lexmark had a

25  "facially valid contract with the consumers who buy and open its cartridges."  *Lexmark*, 421

26  F.3d at 987.  That decision, however, turned on the fact that the consumer was shown the terms

27  of the contract **before the purchase** by virtue of the language on the outside of the packaging,

28  and had an opportunity to accept or reject them.  *Id*. ("Specifically, the language on the **outside**

4

*of the cartridge package* specifies the terms under which a consumer may use the purchased item," and thus the consumer "can read the terms and conditions on the box before deciding whether to accept" or reject them) (emphasis added).  Rather than abrogate the common law requirements for contract formation, the decision in *Lexmark* actually affirms them.  Comparing the allegations here with the facts of *Lexmark*, it is clear that, even under the UCC, Biosearch has not adequately alleged the existence of a contract between the parties.  According to Biosearch, a contract is formed where a party had notice of the contract condition, had a chance to reject the contract, and received consideration in the form of a reduced price in exchange for accepting the condition.  Yet none of the three "notices" alleged by Biosearch demonstrate that Life Tech had notice of the EULA when it purchased BHQ®s from Glen Research.

First, neither the fact that Invitrogen may have received a copy of the EULA in connection with purchases of BHQ®s in 2001 – which are not at issue here – nor the fact that Biosearch may have posted the EULA on its website would have provided notice to Life Tech that unrelated purchases from a different seller would be governed by the EULA.  Biosearch fails to explain how this could constitute knowledge of contract terms on a different sale by a different seller nearly a decade later.  Moreover, Biosearch itself recognizes that the EULA does not govern all purchases of BHQ®, but rather that consumers may purchase BHQ® under different licenses.  *See* Opp'n at 5-6 ("Life Tech had the opportunity to . . . purchase[] . . . BHQ®s under a commercial license.").  Thus, the 2001 BHQ® sales gave no information about what terms future BHQ® sales would be governed by – particularly future sales by other parties.

Second, the allegation that "Glen Research advised its customers in writing and on its website of the restricted use for BHQ®s" is inadequate to establish notice.  Biosearch does not identify the content of the "restricted use" that Glen Research allegedly advised its customers of on its website.  Biosearch cannot allege that some unidentified terms posted by Glen Research on its website are sufficient to bind Life Tech to the EULA attached to Biosearch's FACC.

Finally, the alleged inclusion of the EULA with the shipment of BHQ®s cannot provide the notice required by *Lexmark* because, by the time Life Tech would have seen the EULA, it

would have already purchased the product.  As *Lexmark* recognizes, the disclosure of additional "terms" that would materially alter a contract after a purchase is complete does not support a claim that those additional terms are part of the contract.  *Lexmark*, 421 F.3d at 987, n. 6 ("This case is different from those instances in which a consumer lacks notice of the condition at the time of purchase. *See, e.g., Step-Saver Data Sys. v. Wyse Tech., Inc*., 939 F.2d 91, 105 (3d Cir. 1991) (treating box-top license as an additional term not incorporated into the parties' contract where the term's addition to the contract would materially alter the agreement and the consumer did not see license until after paying for product).").

Moreover, comparing the EULA with the language used in *Lexmark* underscores the inadequacy of Biosearch's allegations.  Lexmark's packaging contained the following language:

> RETURN EMPTY CARTRIDGE TO LEX-MARK FOR REMANUFACTURING AND RECYCLING
>
> Please read before opening. *Opening of this package or using the patented cartridge inside confirms your acceptance of the following license agreement.* The patented cartridge *is sold at a special price subject to a restriction that it may be used only once.* Following this initial use, *you agree* to return the empty cartridge only to Lexmark for remanufacturing and recycling. *If you don't accept these terms, return the unopened package to your point of purchase.* A regular price cartridge without these terms is available.

*Id.* at 983-984 (emphasis added).  Unlike the language in *Lexmark*, the EULA does not warn that (a) opening the package "confirms acceptance" of the EULA's terms; (b) the BHQ®s are being sold at a special price; (c) the purchaser can return the product if it does not accept the EULA's terms; or (d) a differently priced product is available without the EULA.  The EULA is a far cry from the "offer" in *Lexmark*, and renders the *Lexmark* analysis inapplicable here.

Having failed to establish that its allegations meet the standard laid out in *Lexmark*, Biosearch is left without any basis for arguing that, under either the UCC or the common law, it has alleged the existence of a contract with Life Tech.

### 4.     Biosearch's Allegations Also Fail to Satisfy the Pleading Requirements of the Federal Rules

Biosearch's argument that it has met its pleading burden under *Iqbal* and *Twombly* is equally unavailing.  Biosearch argues that it has "unquestionably" met the requirements for

pleading a breach of contract.  Opp'n at 7.  However, the allegations on which Biosearch relies to support this argument actually undermine its position.  Although Biosearch focuses on a lengthy paragraph describing the 2001 sales to Invitrogen, nothing in that paragraph establishes the existence of a contract in 2009.  Those allegations fail to explain how a EULA governing sales to a predecessor company in 2001 would necessarily give notice to a successor company that the same EULA would govern sales by a different seller eight years later, particularly when Biosearch itself admits that not all sales of BHQ®s are governed by the EULA.  Opp'n at 5-6.  The allegations that the EULA was "included in the Biosearch Licensee handbook, [and] published on Biosearch's website" are likewise irrelevant to a later sale from a different seller.

Second, the allegations that Life Tech "was aware of the EULA's existence and terms, understood the limitations imposed by the EULA, and agreed to be bound by the terms of the EULA" (FACC, ¶ 17) are merely conclusions of law – in essence, Biosearch is alleging that Life Tech entered into a contract in the form of the EULA.  Applying the "two-pronged approach" of *Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009), the Court should disregard such allegations as "mere conclusions [which] are not entitled to the assumption of truth."  *Id*. at 1940.

The same analysis warrants rejection of most, if not all, of the allegations on which Biosearch now relies to support its claim that it had a valid contract with Life Tech.

## B.   Biosearch's Remaining State Law Counterclaims Should Also Be Dismissed

Biosearch does not dispute that each of its remaining state law counterclaims is dependent upon the existence of a valid contract between Life Tech and Biosearch.  *See* Opp'n at 9-14.  Instead, Biosearch argues that it has properly pled the existence of a contract.  Because it has not, each of the remaining state law counterclaims should be dismissed.  *See Berryman v. Merit Property Mgmt., Inc.*, 152 Cal.App.4th 1544 (2007) (where plaintiffs lacked standing to recover under the contract, they "cannot use the contracts to bootstrap liability under other theories, such as the UCL, CLRA or common law theories such as negligence").

In addition, Life Tech argued in its Motion that Biosearch's state law counterclaims failed for reasons other than their dependence on a contract that does not exist.  Biosearch's

REPLY MEMORANDUM IN SUPPORT OF PLAINTIFF LIFE TECHNOLOGIES CORPORATION'S
MOTION TO DISMISS FIRST AMENDED COUNTERCLAIMS
CASE NO. 3:10-cv-02665 JAH (MDD)

arguments in opposition fail for the reasons set forth below.

### 1. Unfair Competition and False Advertising Claims Under Bus. & Prof. Code §§ 17200 & 17500

Biosearch's claim that Life Tech's conduct was "unlawful" under Bus. & Prof. Code § 17200 fails because it is premised on the existence of a contract between the parties. *See* FACC, ¶¶ 40-43 (alleging Life Tech "breach[ed] its license obligations to Biosearch" and "wrongfully us[ed] the BHQ®s [purchased from] from Glen Research in contravention of the license terms"). Moreover, even if Biosearch had adequately pled breach of contract, that would not support a § 17200 claim. *Shroyer v. New Cingular Wireless Services, Inc.*, 622 F.3d 1035, 1044 (9th Cir. 2010) (noting that a "common law violation such as breach of contract is insufficient" to state a claim under the "unlawful" prong of § 17200). Biosearch does not dispute this point.[2]

Instead, Biosearch argues that it "does not rely merely on breach of contract as the basis" for this counterclaim, but that it is also based on "Life Tech's unlawful conduct of false advertising," as alleged in its § 17500 counterclaim. Opp'n at 10. Even assuming that a § 17500 claim could support a separate claim under § 17200, Biosearch ignores the fact that its false advertising claim is based solely on Life Tech's purported breach of contract. Opp'n at 9-10; *see also* FACC ¶¶ 30, 33. Having failed to adequately plead a breach of contract, its false advertising claim – and by extension, its related § 17200 claim – also fails.

### 2. Intentional Interference with Prospective Economic Advantage

Biosearch argues that its claim for intentional interference with prospective economic advantage is based on its false advertising allegations. Yet as explained above, that is a distinction without a difference, because the false advertising claim turns on the existence of a valid contract between Life Tech and Biosearch, which Biosearch has not adequately alleged.

Those deficiencies are enough to warrant dismissal of Biosearch's intentional interference claim. However, Biosearch also failed to adequately plead Life Tech's knowledge

---

[2] Biosearch also fails to contest – and thus concedes – Life Tech's argument that Biosearch failed to adequately plead that Life Tech's conduct was an "unfair" business practice. *See* Mtn. at 17:3 – 18:2; Opp'n at 10:24 – 11:4.

of Biosearch's purported relationship with Gene Logic, or that Life Tech's acts were intended to interfere with Biosearch's relationship with its customers.  In response, Biosearch argues that it is not required to allege knowledge or intentional interference with any level of detail.  Opp'n at 11:25 - 12:4 (citing *Monex Deposit Co. v. Gilliam*, 680 F. Supp. 2d 1148, 1162-63 (C.D. Cal. 2010)).  *Monex*, however, was a summary judgment decision, and thus did not address the appropriate degree of factual pleading required to state a claim for intentional interference. Moreover, *Monex* recognized that although a "defendant need not know exactly who is a party to the contract," he must "know[] he is interfering with a contractual relationship." *Id.* at 1163. Here, there is no allegation that Life Tech "knew" it was interfering with any Biosearch contract.

Biosearch also cites to *B. Aronson, Inc. v. Bradshaw Int'l, Inc.*, Case No. CV 11-531 CAS (SSx), 2011 U.S. Dist. LEXIS 47769, at *18 (C.D. Cal. April 25, 2011).  Its analysis of that case, however, is misleading.  Contrary to Biosearch's contention, the court did not find that the allegations concerning the claim for intentional interference with prospective economic advantage were adequate.  *See id.* at *23 (dismissing the claim without prejudice).  The language to which Biosearch refers (on page 18 of the opinion) is merely a recitation of the plaintiff's argument, not the court's conclusion.  Indeed, defendants did not even argue that the plaintiff had failed to adequately plead knowledge of its business relationships.  *Id.* at *9-10.[3]

### 3. Common Law Unfair Competition

Relying on *Coupons, Inc. v. Stottlemire*, 588 F. Supp. 2d 1069, 1075 (N.D. Cal. 2008), Biosearch argues that its claim for common law unfair competition is adequately pled because allegations of "passing off" are not required.  However, looking at the elements of common law unfair competition set out in *Coupons*, it is clear that they essentially describe the act of "passing off" one's goods as those of another.  *See id.* at 1075 (listing factors including appropriation and use of plaintiff's property by another without authorization or consent). Indeed, the case on which *Coupons* relies, *City Solutions, Inc. v. Clear Channel Comms.*, 365

---

[3] Biosearch has also failed to adequately plead intentional acts designed to disrupt Biosearch's relationship with its customer, Gene Logic.  *See* Mtn. at 20:16 – 21:9.

F.3d 835, 842 (2004), involved a defendant who misappropriated plaintiff's business plan and submitted it to the City of San Francisco as defendant's own, thereby winning a City contract. That is precisely the type of "passing off" that forms the basis of a common law unfair competition claim in California.  *See, e.g.*, *Sybersound Inc. v. UAV Corp.*, 517 F.3d 1137, 1153 (9th Cir. 2008); *Bank of the West v. Superior Court*, 2 Cal.4th 1254, 1263 (1992); *Southland Sod Farms v. Stover Seed Co.,* 108 F.3d 1134, 1147 (9th Cir. 1997).  Biosearch does not contest that it has not alleged that Life Tech "passed off" Biosearch's goods as its own (*see* Mtn. at 22:1-16), and thus its claim for common law unfair competition should be dismissed.

### C.   Biosearch's State Law Counterclaims Should Be Dismissed With Prejudice Because Amendment Would Be Futile

The Court should also reject Biosearch's request for leave to amend its state law counterclaims, and should instead dismiss them with prejudice.  Both the breach of contract claim, and the additional claims discussed above, depend upon the existence of a contract between Life Tech and Biosearch that incorporates the EULA.  However, Biosearch has not adequately alleged such a contract, and has not demonstrated here that it ever could.  Given the futility of permitting Biosearch to amend its counterclaims yet again, the Court should dismiss them with prejudice.  *See, e.g., In re DRAM Antitrust Litigation*, 546 F.3d 981, 990 (9th Cir. 2008) (dismissal with prejudice appropriate where amendment would be futile).[4]

### III.   CONCLUSION

For these reasons, Life Tech respectfully requests that the Court dismiss the state law counterclaims (the First through Fifth Counterclaims) with prejudice.

Dated:  August 1, 2011                    KRIEG, KELLER, SLOAN, REILLEY & ROMAN LLP

By:   /s/ Kenneth E. Keller
KENNETH E. KELLER
Attorneys for Plaintiff and Counterclaim-Defendant
LIFE TECHNOLOGIES CORPORATION

---

[4] Life Tech did not, as Biosearch claims, "misleadingly suggest" that the *Manzarek* court dismissed the claims at issue as futile, but rather cited *Manzarek* for the undisputed proposition that dismissal with prejudice is appropriate if amendment would be futile.  *See* Mtn. at 22.